[No. 30666.   Department Two.   March 18, 1949.]

LUCY SITAREK, a Minor, by Polia Sitarek, her Guardian ad Litem, Respondent, v. AUDREY FAY MONTGOMERY, Defendant, LEROY LADELY et al., Appellants.[1]

*McMicken, Rupp & Schweppe,* for appellants.

*Wm. B. Magee,* for respondent.

[1]Reported in 203 P. (2d) 1062.

BEALS, J.—During the month of January, 1947, the defendant Audrey F. Montgomery (a divorcee), with her three young children, was living in a house on the south side of Kenyon Place southwest in the city of Seattle. Mrs. Montgomery was employed as a cashier in a clothing store. Across the street, and a little to the east, the defendants Leroy and Martha Ladely resided with their six-year-old son. Mrs. Polia Sitarek, a widow, with her fourteen-year-old daughter, Lucy, resided on the north side of Kenyon Place, two or three houses west of the Ladely home.

Mrs. Montgomery was well acquainted with one Charles Clark, and some time prior to January 22, 1947, Clark's attentions to Mrs. Montgomery had become offensive to her and she desired to have nothing more to do with him. Apparently, her wishes accentuated Clark's pursuit of the lady, and his conduct became threatening and finally violent. He physically molested her upon a public street and in her home, and finally, when she refused to admit him and locked the doors to her house, he entered by breaking down a door and chased Mrs. Montgomery down the street, she taking refuge in a neighbor's home.

Mrs. Montgomery reported the matter to the police, asking for protection. Apparently, she received none that was effective, although members of the police force called on her on several occasions. Mrs. Montgomery also consulted a member of the prosecuting attorney's staff, who telephoned Clark, obtaining the latter's promise that he would not further molest the lady. Clark later reproached Mrs. Montgomery for calling the police and visiting the prosecuting attorney, telling her, as she testified, that he intended to get even with her for all of the trouble she had caused him. For some days she, with her children, visited her sister and brother-in-law, where Clark telephoned her again, threatening to do her harm. She and her children returned home, where some of her relatives remained with her for a time during which Clark, on several occasions, picketed the house, Mrs. Montgomery's brother-in-law on one occasion chasing him away. Clark again threatened Mrs. Montgomery over the telephone.

On a Saturday evening, Mrs. Montgomery's brother-in-law brought a shotgun and two shells to Mrs. Montgomery, showing her how to load the gun.

Clark continued to shadow the lady, and, from the testimony contained in the statement of facts, it appears that she was afraid that Clark would do her great bodily injury and that her fears were well founded.

During the early evening of January 22nd, Clark visited Mrs. Montgomery's home and, when she menaced him with her shotgun, threatened to arm himself and return. She was very much frightened and telephoned Mr. Wroth, a neighbor, and two of her male relatives. Mr. Wroth went immediately to her home and escorted Mrs. Montgomery and her three children to the Ladely home nearby, where Mrs. Montgomery's stepfather and brother-in-law found her, the latter taking the three children to their home to prepare their dinner.

It was agreed that Mrs. Montgomery's sister and brother-in-law would spend the night with her, and that Mr. Ladely would remain with Mrs. Montgomery and the children at their home until the arrival of the sister and her husband. Apparently, the brother-in-law again, in vain, requested police protection. Mrs. Ladely having left home to attend a social gathering, Mr. Ladely went to Mrs. Sitarek's home, requesting that Lucy Sitarek act as "baby sitter" with the Ladely boy, as she had on previous occasions. The arrangement was accomplished, and Lucy went to the Ladely home, whereupon Mr. Ladely went to Mrs. Montgomery's home, and her stepfather and brother-in-law departed.

Sometime during the evening, probably between nine and nine-thirty o'clock, Ladely visited his own home to assure himself that all was well there and to open the garage door, so that when his wife returned she could drive her car into the garage. He testified that he saw Lucy and, after an absence of about ten minutes, returned to the Montgomery home, where, as he stated, he passed the time talking with Mrs. Montgomery and reading.

Concerning Mr. Ladely's visit to his home, Lucy testified that the little boy was asleep and that Mr. Ladely told her

"not to bother him and that he would go over to Mrs. Montgomery's house, and I didn't know what for so I listened to the radio until about 10:00," and that Mr. Ladely said, "I am going over to Mrs. Montgomery," and "Don't tell my wife and don't tell anybody. I will be back soon."

She then testified that, after listening to the radio until the programs were over, she phoned her mother and asked her if she "could come down and get my bobby pins," that she went to her home, and then, knowing that Mr. Ladely was at Mrs. Montgomery's, went to the latter's house to ask Mr. Ladely if, when she (Lucy) went to bed, she should leave the front door locked or open. She testified that she did not know whether Mrs. Ladely had with her a key to the house, and thought that, if Mrs. Ladely did not have a house key, she should leave the door unlocked so that Mrs. Ladely could enter.

It appears that, on some previous occasions, when Lucy had taken care of the Ladely boy, she had remained at the Ladely home overnight.

Lucy testified that she stepped up on the porch of the Montgomery home and, seeing a dim light in the living room, knocked three times on the door, hearing no answer. Mrs. Montgomery testified that she heard someone step on the porch and knock lightly at the door and that, when, two or three times, she asked who was there, she heard no answer. Mr. Ladely's testimony was to the same effect.

Mrs. Montgomery then testified that, believing that Clark had returned and being in fear of an attack from him, she discharged the loaded shotgun through the door. While, apparently, no shot struck Lucy, some fragments of wood, glass, or wire netting struck her face, injuring her right eye to some extent and wounding one cheek.

The next morning, Mrs. Montgomery and Ladely reported to the prosecuting attorney and to police headquarters. Criminal charges were filed against both of them, which were later dismissed as to Ladely.

March 12, 1947, this action was instituted by Lucy Sitarek, her mother, Polia Sitarek, acting as her guardian *ad litem*, against Mrs. Montgomery and Mr. and Mrs. Ladely

as a marital community, the complaint alleging the firing of the shot by Mrs. Montgomery, who was "accompanied by the defendant, Leroy Ladely, in the home of the defendant Montgomery." The complaint alleged that Mrs. Montgomery fired without warning, and that in so doing she was guilty of wanton and gross negligence. The complaint alleged that, as the result of the shot, the vision of Lucy's right eye had been partially destroyed, that her face would be permanently scarred, and that she had suffered and was still suffering great pain and was still under the doctor's care.

Judgment for damages was demanded "against the defendants, and each of them," in the sum of five thousand dollars.

The defendants Ladely answered the complaint, denying all negligence on their part and asking that, as to them, the action be dismissed. The jury returned a verdict in plaintiff's favor against Mrs. Montgomery and against "Leroy and Martha Ladely, husband and wife," in the sum of fifteen hundred dollars. The defendant Leroy Ladely moved for judgment in his favor notwithstanding the verdict or, in the alternative, for a new trial, and a similar motion was interposed by Mr. and Mrs. Ladely as a marital community.

These motions having been denied, judgment was entered upon the verdict in plaintiff's favor against the defendants "Audrey Fay Montgomery, Leroy Ladely and the community composed of Leroy Ladely and Martha Ladely, husband and wife." From this judgment, "Leroy Ladely and Martha Ladely, husband and wife," have appealed.

It should be noted that this appeal is prosecuted only by Mr. and Mrs. Ladely as a marital community. Judgment was entered against Leroy Ladely, individually, but as an individual he has prosecuted no appeal. Mrs. Montgomery did not appeal.

Appellants assign error:

"(1) In failing to sustain appellants' challenge to the opening statement of respondent's counsel.

"(2) In failing to sustain the appellants' motion for dismissal made at the conclusion of the respondent's case.

"(3) In the giving of jury instruction numbered 5 to which exception was taken at the time and reasons therefor given.

"(4) In denying motion for judgment notwithstanding the verdict or for a new trial made by these appellants as a marital community, separately and apart from the motion therefor made by the defendant, Leroy Ladely, individually."

These assignments of error present, in essence, the same contention, namely, that the evidence introduced fails to support any judgment against the marital community composed of Leroy and Martha Ladely, as husband and wife.

■ We are mindful of the rule that, upon an appeal from a judgment entered upon the verdict of a jury, the evidence which is introduced in the cause should be so considered as to support the jury's verdict, and that the judgment should be affirmed unless it be held, as a matter of law, that the verdict finds no support in the evidence.

It is not disputed that Mrs. Ladely left her home a few minutes before eight o'clock on the evening of January 22nd. It was after her departure that Mr. Ladely secured Lucy Sitarek to care for their son during the evening. Mr. Ladely testified that he told Lucy that Mrs. Montgomery was having trouble and that, during the evening, he would be either at Mrs. Montgomery's home or somewhere in the neighborhood. He denied that he, at any time, told Lucy not to tell anyone where he would be during the evening.

As indicated by the court's instruction No. 5, to which appellants excepted, it was the theory of the trial court that, as the care of the Ladely child was a community obligation, Lucy Sitarek was employed by the community; and that if the defendants, at the time she was employed, knew or should have known that, in the course of the performance of her duties, Lucy might reasonably be expected to be exposed to some hazard or danger then known to the Ladelys and unknown to Lucy, it was the duty of the Ladelys to adequately advise and warn Lucy concerning any hazard or danger incident to her employment; and that, if the Ladelys were negligent in failing to so advise and

warn Lucy, and if she herself was not negligent, the jury might bring in a verdict against the community composed of the defendants Ladely.

The basis of any liability on the part of defendants, according to the court's theory, was, of course, that, from the evidence, the jury might find that Leroy Ladely, as a reasonable man, should have known that, while caring for his son, Lucy might be exposed to some danger due to the tense situation surrounding Mrs. Montgomery's home, and that something might happen which would result in an injury to Lucy.

It may be noted that there was a telephone in each of the three houses concerned, the Ladely house, the Montgomery house, and the Sitarek house. Lucy, of course, understood the use of the telephone, as she testified that, during the evening, she telephoned her mother.

The record contains no evidence which even tends to suggest that Mr. Ladely, by word or gesture, suggested to Mrs. Montgomery that she fire the shotgun. If the verdict against appellants is to be sustained, it should also be sustained had Mr. Ladely, at the time the shot was fired, been at some distance from the Montgomery home.

Of course, under the circumstances as disclosed by the evidence, the firing of the shot by Mrs. Montgomery amounted to more than negligence. She was not justified in firing through the door in the absence of any overt act on the part of the person knocking. The gun was not discharged by accident, Mrs. Montgomery testifying that she deliberately pulled the trigger. The occasion of the injury to Lucy was Mrs. Montgomery's tortious act.

If it be contended that Mr. Ladely's presence in the Montgomery home in any way involved him in this tort, the community, composed of himself and Mrs. Ladely, would not be responsible for the injuries to Lucy, as certainly it could not be held that the firing of the shotgun by Mrs. Montgomery had anything to do with the management of the community property, or that it was for the benefit of the community.

In *Bergman v. State*, 187 Wash. 622, 60 P. (2d) 699, 106 A. L. R. 1007, we held that the responsibility of the community for any tortious act of the husband is founded upon the doctrine of *respondeat superior*, and that "unless, in a given instance, it can be said that the husband was acting as the agent of the marital community, the community is not liable."

The question, then, to be determined is whether, from the evidence, the jury were justified in finding that, on the evening in question, there was some hazard or danger to which Lucy might be exposed during the course of her employment as baby sitter, which hazard was unknown to Lucy and was known to Leroy Ladely; and that, in failing to warn Lucy of such possible danger he, as a member of the community, was negligent; and that, as a proximate result of such negligence, Lucy was injured.

It is true that Ladely knew that some unpleasant and possibly dangerous situation might arise in or near the Montgomery home. This possible danger, however, was not, by anyone, deemed sufficiently serious to require the removal of the Montgomery children from the house. Clark had been warned to stay away from the place and knew that Mrs. Montgomery was armed. Clark also knew that it was unlikely that, if Mrs. Montgomery remained in her home, she would be there alone. As events proved, Clark did not attempt to molest Mrs. Montgomery that evening.

Before the judgment appealed from may be affirmed as against appellants, it must be held that, from the evidence, the jury could find that a situation existed which might bring Lucy, in connection with her employment by the Ladelys, into a hazardous situation, namely, that possibly she might visit the Montgomery home, or even walk along the street nearby, which might result in injury to her, and that, with this idea in mind, Leroy Ladely should have warned Lucy to remain indoors.

In Prosser on Torts, 364, appears the following:

"*Unforeseeable Results of Unforeseeable Forces*

"If the defendant can foresee neither any danger of

direct injury, nor any risk from an intervening force, he is simply not negligent."

After citing certain instances upon which negligence cannot be predicated, the author continues:

"But once the defendant's negligence is established, because injury of some kind was to be anticipated, intervening forces which could not reasonably be foreseen, and which are no normal part of the risk created, may bring about results of an entirely different kind.

"It is here at least that the line must of necessity be drawn to terminate the defendant's responsibility. The courts have exhibited a more or less instinctive feeling that it would be unfair to hold him liable. The limitation of liability to cover only those intervening forces which lie within the scope of the foreseeable risk is based upon a recognition of the fact that the independent forces which may intervene to change the situation created by the defendant are infinite, and that as a practical matter responsibility cannot be carried to such lengths."

The text then continues by stating certain instances in which defendant is not liable, including

". . . the more unpredictable behavior of irresponsible persons or children who get themselves into trouble or injure others. The more unusual, extraordinary forms of negligent conduct of adults, against which the defendant was under no obligation to take precautions, have been held to be superseding causes: the reckless or unusual driving of vehicles, tampering with dangerous articles, . . ."

In the case of *Palsgraf v. Long Island R. Co.*, 248 N. Y. 339, 162 N. E. 99, 59 A. L. R. 1253, the court, speaking through Chief Justice Cardozo, said:

"Even then, the orbit of the danger as disclosed to the eye of reasonable vigilance would be the orbit of the duty. One who jostles one's neighbor in a crowd does not invade the rights of others standing at the outer fringe when the unintended contact casts a bomb upon the ground. The wrongdoer as to them is the man who carries the bomb, not the one who explodes it without suspicion of the danger. Life will have to be made over, and human nature transformed, before prevision so extravagant can be accepted as the norm of conduct, the customary standard to which behavior must conform."

While the facts in the case cited are entirely different from those in the case at bar, the language quoted is applicable to the situation here presented.

In *Atchison, Topeka & Santa Fe R. Co. v. Calhoun*, 213 U. S. 1, 53 L. Ed. 671, 29 S. Ct. 321, appears the following:

"It has been well said that 'if men went about to guard themselves against every risk to themselves or others which might by ingenious conjecture be conceived as possible, human affairs could not be carried on at all. The reasonable man, then, to whose ideal behavior we are to look as the standard of duty, will neither neglect what he can forecast as probable, nor waste his anxiety on events that are barely possible. He will order his precaution by the measure of what appears likely in the known course of things.' Pollock on Torts, 8th ed., 41."

Cases such as *Holshouser v. Denver Gas & Electric Co.*, 18 Colo. App. 431, 72 Pac. 289, in which the court held that an employer, who, at the time he engaged a workman, knew that there was danger of the latter being injured due to the existence of a strike concerning which the employee had no knowledge, was liable for injuries suffered by the workman as the result of a shot fired by strikers; and the case of *Baxter v. Roberts*, 44 Cal. 187, 13 Am. Rep. 160, in which it was held that the owner of property, who knew that the claimed location of his property line was contested by a neighbor, was responsible for injuries suffered by a carpenter employed to work in the danger zone, the employer knowing that such work would probably be forcibly resisted, are not here in point. In each of the cases cited, the employee was hired and deliberately placed in a position which the employer knew would be dangerous, the employee having no knowledge of the danger.

No such situation is presented in the case at bar, where the employment of a baby sitter would, normally, be perfectly safe and, in this instance, would have been safe, save for the occurrence of a succession of most unusual and unforeseen events which, by no flight of the imagination, could have been anticipated.

In the first place, can it be said that Mr. Ladely, in the exercise of good judgment, should have foreseen the pos-

sibility that Lucy would go to the Montgomery home? In the Ladely home a telephone was available to her by which she could communicate with Mr. Ladely at any time. Should it be supposed that Mr. Ladely might have anticipated that Lucy would leave her charge, a short time after Mr. Ladely had talked with her, in order to ask him a question which she could as well have asked over the telephone?

Again, viewing the situation as it appeared to Mr. Ladely on the evening in question, it cannot be held that a reasonable person in Mr. Ladely's situation would have thought of the possibility that Lucy would, at a late hour that evening, go to Mrs. Montgomery's home and knock at the door, and that Mrs. Montgomery would fire the shotgun through the door, thereby injuring Lucy. That was the particular event that brought about the unfortunate result which is the basis of this case. We hold that, at the time mentioned, a reasonable person in Mr. Ladely's position could not have been expected to anticipate any danger to Lucy which would place upon him the burden of warning her to remain in the Ladely house or not to go to the Montgomery house.

It is easy to project the shadow of past events into a more remote past and to add form and color to a situation, which color and form were absent at the time the situation must be considered and estimated.

The trial court erred in denying the motion of the defendants Leroy Ladely and Martha Ladely, husband and wife, as a marital community, for judgment in their favor notwithstanding the verdict, and in entering judgment against Mr. and Mrs. Ladely as a marital community. The judgment appealed from is accordingly reversed on appellants' appeal, and the cause will be remanded, with instructions to eliminate from the judgment the portion of the judgment rendered against the defendants Leroy Ladely and Martha Ladely, husband and wife, as a marital community.

After the notice of appeal was given by the appellants herein, the trial court, pursuant to a stipulation between the parties, fixed the amount of a cost and supersedeas

bond on appeal in the aggregate sum of seventeen hundred fifty dollars, the order stating that money in that amount might be deposited with the clerk of the superior court in lieu of a written bond.

Thereafter, Mr. and Mrs. Ladely, with a "notice of deposit," deposited with the clerk of the superior court for King county, the sum of seventeen hundred fifty dollars as security for the payment to the respondent of all costs and damages that might be awarded against the defendants named on their appeal or on the dismissal thereof, and for the satisfaction of the judgment against appellants in case it should be affirmed.

Upon the going down of the remittitur herein and the accomplishment of the mandate therein contained, these appellants having prevailed upon this appeal, the cash deposit made by appellants in lieu of a formal cost and supersedeas bond on appeal, will stand exonerated.

ROBINSON, SIMPSON, and HILL, JJ., concur.

SCHWELLENBACH, J. (dissenting)—The majority opinion states:

"We are mindful of the rule that, upon an appeal from a judgment entered upon the verdict of a jury, the evidence which is introduced in the cause should be so considered as to support the jury's verdict, and that the judgment should be affirmed unless it be held, as a matter of law, that the verdict finds no support in the evidence."

The opinion then proceeds to state that "Mr. Ladely testified that he told Lucy that Mrs. Montgomery was having trouble and that, during the evening, he would be either at Mrs. Montgomery's home or somewhere in the neighborhood."

I wish to add briefly to the facts as stated by the majority. On the evening in question, Mr. Ladely drove Mrs. Montgomery home from work, and she told him of the trouble she was having with Clark. About six-thirty, while she was preparing dinner, Clark tried to get in again. She had a gun in the house and threatened to shoot him. He left, saying he would return. She then ran across the street

with her three children, to the Ladelys. She was in a highly nervous state and told of having driven off Clark with a gun. Later, her brother-in-law and stepfather came and took her home. Ladely went with them, but returned soon because his wife was going to a shower, and he was to stay home and take care of their boy.

Shortly after Mrs. Ladely left, and at about seven o'clock, Ladely went to the Sitarek house to get Lucy, who was fourteen years old, to· come to his house and act as a baby-sitter. In a very short time he left, telling her he was going to Mrs. Montgomery's. Lucy denied that he told her that Mrs. Montgomery was having trouble, or that he said that, during the evening, he would be either at Mrs. Montgomery's home or somewhere in the neighborhood. She testified that she knew nothing of Mrs. Montgomery's trouble.

When Ladely got to the Montgomery house, the brother-in-law and stepfather were just leaving. As they were leaving they saw Clark lurking around outside and chased him. They reported this to Mrs. Montgomery and Ladely.

It must be remembered that this case was submitted to a jury, which rendered a verdict for the plaintiff; that the Ladely community presented a motion for judgment n.o.v. which was denied by the trial court; and that this appeal is from the order denying such motion.

A challenge to the sufficiency of the evidence, a motion for nonsuit, a motion for a directed verdict, or a motion for judgment notwithstanding the verdict admits the truth of the plaintiff's evidence and all inferences that can be drawn therefrom, and requires that the evidence be interpreted most strongly against the defendant, and in the light most favorable to the plaintiff. *Billingsley v. Rovig-Temple Co.*, 16 Wn. (2d) 202, 133 P. (2d) 265, and cases cited therein.

Having the above test in mind, in reviewing the ruling on a motion for judgment n.o.v., we must consider the following evidence. The Ladely community, acting through Mr. Ladely, employed Lucy as. a baby-sitter on the. night in question. She knew nothing of Mrs. Montgomery's trouble. Mr. Ladely did not so advise her, although he was well

aware of it. He had brought Mrs. Montgomery home from work that evening, and she had told him of her trouble. At six-thirty that evening, she had come over to the house in a highly nervous state, with her three children, and had told of driving off Clark with a gun. He went over to her house to protect her from Clark. He told Lucy where he was going. Under the circumstances, he should have realized that she, as his employee, might have occasion to seek him out. Here was a fourteen-year-old girl who, by virtue of the contract of employment, was entitled to reasonable protection. Being aware of the highly dangerous and explosive situation existing, it was his duty to warn her. She should have been advised as to any and all dangers and hazards she might reasonably be expected to encounter in carrying out her duties as a baby-sitter. His failure to warn her constituted negligence. This negligence was the negligence of the community. The community hired her, and the community owed that duty to her.

The following rule is stated in Restatement of the Law, 1183, Agency, § 504:

"The master's duty as to working conditions does not extend to the condition of premises not in his control, nor to the conduct of third persons with whom the servants are to be brought into contact during the course of the work, except that he has a duty to disclose dangerous conditions of which he should know.

"Comment:   .   .   .

"b. *Duty of Warning.* The master's duty that care be used to make the conditions of employment reasonably safe for his servants includes a duty of supervision over the conditions under which they work, and a duty of warning them of dangerous conditions of which he should know. Thus, if a builder employs a subcontractor to do work upon the premises which he controls, his duty of supervision includes a duty of care to see that the conditions created by the subcontractor are not harmful to his own servants, and if he becomes aware of dangerous conditions he is under a duty to use care to correct them or to warn his servants. Likewise, a master is subject to liability to his servants for directing them to work, without warning, in the vicinity of third persons who, as he should know, are likely to harm his servants, as where the master knows that the third per-

sons are doing work intrinsically dangerous to those in the vicinity or that his servants are likely to be hurt because of their ignorance of work being done near them."

In *Holshouser v. Denver Gas & Electric Co.*, 18 Colo. App. 431, 72 Pac. 289, it was held that where a master had knowledge, when he employed a servant, that the latter was in danger of being injured by striking employees, and the servant had no knowledge of this fact, and was shot by striking employees after having been employed about eighteen days, the master's failure to give the servant warning was actionable negligence, in that the employer knowingly exposed the employee to personal danger, and concealed the danger from him.

In *Baxter v. Roberts*, 44 Cal. 187, 13 Am. Rep. 160, Roberts was the owner of a certain lot, and employed the plaintiff to perform labor there as a carpenter. While Roberts, the plaintiff, and another employee, were tearing some boards from a newly erected fence, they were shot at from an adjoining lot and the plaintiff was injured. The evidence showed that when Roberts hired the plaintiff he knew, or had information such as would reasonably lead him to believe that his interference with the newly constructed fence would be forcibly resisted; and that such knowledge was not conveyed to the plaintiff. In holding Roberts liable for damages sustained, the court said:

"The general principle which forbids the employer to expose the employee to unusual risks in the course of his employment, and to conceal from him the fact of such danger, is not affected by the fact that the danger known to the employer arose from the tortious or felonious purposes or designs of third persons acting in hostility to the interests of the employer and through agencies beyond his control. The employee is as clearly entitled to information of such known danger of that character as of any other the existence of which is known to the employer. The employer, if he knew or was informed of a threatened danger of that character, was bound to communicate the information to his employee about to be exposed to it in the course of his employment and in ignorance of its existence. The nature or character of the agency or means through which the danger of injury to the employee is to be apprehended

can make no difference in the rule, for the employee is entitled in all cases to such information upon the subject as the employer may possess, and this with a view to enable him to determine for himself if at the proffered compensation he be willing to assume the risk and incur the hazard of the business; and if the employer have such information or knowledge and withhold it from the employee and the latter afterwards be injured in consequence thereof, the employer is liable to him in damages therefor."

I am fully cognizant of the "foreseeability" doctrine. In applying that doctrine, however, the court must use the test of a reasonable man.

"The standard by which the conduct of a person in a particular situation is judged in determining whether he was negligent is the care which an ordinarily prudent person would exercise under like circumstances. As has been said, negligence is the omission to do something which a reasonable man, guided by those considerations which ordinarily regulate the conduct of human affairs, would do, or the doing of something which a prudent and reasonable man would not do. Concisely stated, the test of due care is the supposititious course of an ordinarily prudent and careful person under the same circumstances." 38 Am. Jur. 676, Negligence, § 30.

There is no question but that Mr. Ladely did not anticipate that Lucy would leave his house, where she was employed to take care of his child, and step up on the Montgomery porch. Neither did he foresee that Mrs. Montgomery would shoot through the door and hit Lucy. But those things actually did happen. It seems to me that he, as a reasonable man, having in mind his responsibility to this young girl, and realizing the situation in the Montgomery house, should have foreseen that what did happen, could have happened. A reasonable man would have, under the circumstances, warned her of the danger. When Lucy went across the street to Mrs. Montgomery's house, she was not on a project of her own. She went to see her employer to find out if she should leave the door unlocked or not. Her going over there was within the scope of her employment. She was injured as a proximate result of the negligence of Mr. Ladely, acting for the community, in failing to advise

her of the danger. The jury found, under proper instructions, that the community was negligent in the performance of its duty to the respondent, and there is sufficient evidence to support the verdict.

The judgment should be affirmed.

---

May 2, 1949. Petition for rehearing denied.